## COMMONWEALTH *vs.* CLAIRE MILLER.

No. 05-P-1252.

Middlesex. September 21, 2006. - May 4, 2007.

Present: LENK, BERRY, & KATZMANN, JJ.

*Constitutional Law,* Admissions and confessions. *Evidence,* Admissions and confessions. *Practice, Criminal,* Admissions and confessions, Voluntariness of confession, Hearing on involuntariness of inculpatory statements.

The judge at a criminal trial erred in failing to conduct an evidentiary hearing in the absence of the jury concerning the admissibility of the defendant's confession to private investigators, where the defendant had presented evidence framing a substantial question regarding the voluntariness of that confession. [841-844]

COMPLAINT received and sworn to in the Lowell Division of the District Court Department on March 25, 2003.

The case was tried before *James M. Geary,* J.

*Nelson P. Lovins* for the defendant.

*Miriam S. Pappas,* Assistant District Attorney, for the Commonwealth.

BERRY, J. The principal issue on appeal in this case involves the obligation of a trial judge to conduct an evidentiary hearing and to enter a preliminary ruling concerning the admissibility of a defendant's confession, precedent to placement of that confession before the jury, where there is squarely framed a substantial question concerning the voluntariness of that confession. See *Commonwealth* v. *Tavares,* 385 Mass. 140, 150-151, cert. denied, 457 U.S. 1137 (1982). Before a confession is spread on the trial record before the jury, such an evidentiary hearing, followed by a preliminary determination by the trial judge that the confession was voluntary, is constitutionally required.[1] The

---

[1] "The Federal Constitution of course requires that at some point in the proceedings, before a confession is admitted in evidence, the defendant must

requirement that there be an evidentiary hearing outside the presence of the jury, followed by a judicial decision on voluntariness, applies even when, as here, the confession was obtained, not by government law enforcement, but rather by private investigators.

In this case, tried to a jury in the District Court, it was very much a live issue whether the defendant's confession was of free will and rational intellect, or instead was elicited by oppressive interrogation techniques of the in-house investigators of the defendant's employer, Home Depot. "Once a defendant has presented evidence that the statements at issue were made involuntarily, the burden is on the Commonwealth to prove beyond a reasonable doubt that the statements were made voluntarily." *Commonwealth* v. *Selby,* 420 Mass. 656, 663 (1995). Notwithstanding troubling evidence concerning isola-

---

'have a fair hearing and a reliable determination [by a judge] on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession.' " *Commonwealth* v. *Garcia,* 379 Mass. 422, 442 n.13 (1980), quoting from *Jackson* v. *Denno,* 378 U.S. 368, 376-377 (1964).

That the Massachusetts "humane practice" operates to have the jury independently determine whether they are satisfied beyond a reasonable doubt that the confession or admission was a voluntary act is not a substitute for the Federal constitutional requirement that the trial judge make a determination of voluntariness as an initial matter *before* the jury hears the confession. On this distinction between the first stage, i.e., the judge's preliminary determination of voluntariness (which is constitutionally mandated), and the second stage, i.e., the jury's reconsideration of voluntariness (which is not constitutionally mandated), see *Commonwealth* v. *Cole,* 380 Mass. 30, 39-40 (1980), which states:

> "Our 'humane practice' requires that 'when statements amounting to a confession are offered in evidence, the question whether they were voluntary is to be decided at a preliminary hearing by the presiding judge in the absence of the jury. If he is satisfied that they are voluntary, they are admissible; otherwise they should be excluded. If the judge decides that they are admissible, he should then instruct the jury not to consider the confession if, upon the whole evidence in the case, they are satisfied that it was not the voluntary act of the defendant.' *Commonwealth* v. *Marshall,* 338 Mass. 460, 461-462 (1959), and cases cited therein. *While this so called "Massachusetts practice" was approved in* Jackson v. Denno, *378 U.S. 368, 378 (1964), the second prong of it — jury reconsideration — is not constitutionally mandated.* See *Lego* v. *Twomey,* 404 U.S. 477, 489-490 (1972)." (Emphasis added.)

See also *Commonwealth* v. *Garcia,* 379 Mass. at 442 n.13 ("This court has never held, as a matter of constitutional law, that the defendant has a right to have the jury reconsider the voluntariness of his confession").

tion and coercive questioning — enhanced in effect by the defendant's mental condition and distraught reactions — the trial judge did not conduct an evidentiary voir dire hearing, and did not independently assess the voluntariness of the confession. Instead, the judge reasoned, such issues were to be left for the jury's deliberation.

In the absence of the defendant's confession, the Commonwealth's proof of the defendant's guilt was far from strong, and from all that appears in the record, the defendant's confession was integral to conviction. Because the confession was critical evidence, perhaps outcome determinative, we reverse.

1. *The inchoate trial evidence and the impact of the confession.* We briefly reference the trial evidence to provide the backdrop against which to measure the impact of the defendant's confession. We then turn to the evidence concerning the manner in which the interrogation of the defendant was conducted by the in-house investigators.

The Commonwealth's theory of proof on the larceny over $250 charge was that some $1,000 was missing from the defendant's cash register after she finished working her shift at Home Depot on February 20, 2003, and that missing paperwork reconciling cash in, general receipts, and transfers out of the defendant's cash register drawer pointed to the defendant as the most likely pilferer of the money. The defendant's confession was pivotal in locking in the prosecution's theory of proof. However, there was counterpointal evidence suggesting that another person or persons may also have had the opportunity and means to take the money. Specifically, the evidence showed that there were a number of other employees who might have been involved in the process of transferring cash from the registers and that these other employees may also have had access to the vault to which the cash was transferred. The wider universe of persons with potential access to cash taken in through the defendant's register also encompassed persons with access to the accounting paperwork, including so-called "slips" generated in connection with transfers of cash from a particular register to the vault, and this access could again potentially lead to paperwork being diverted from the main accounting stream and disappearing before being reconciled in the final day's accounting for a register.

The system for the transfer of cash from a register to the vault, the attendant paperwork, and the accounting therefor may be briefly described as follows. Cashiers wrapped large amounts of cash (over $500) in their registers into "strips." The cash so stripped and packaged was forwarded with a two-part slip to the vault via a pneumatic tube system. A bookkeeper in the vault then separated one copy of the slip and returned the second copy to the originating cashier to be placed in the register to account for the cash taken out and transferred.

At day's end, the cashier was to turn over her remaining cash in the register; prepare a till sheet, recording the day's cash receipts and other transactions; and compile all financial records, including all slips for strips of cash sent through the pneumatic tube system. In connection with the case against the defendant, Home Depot's bookkeeper testified that on February 21, 2003, she discovered a shortfall of $1,000 for the defendant's cash register for the prior day, February 20, 2003, and that bookkeeping did not have a slip for a $1,000 strip of cash transferred from the defendant's register to the vault.

The pneumatic tube system, however, had points of vulnerability. John Skafidas, a former department manager at the Home Depot store, testified that the pneumatic tube system sometimes caused the cash to get stuck. When that happened, another Home Depot employee, acting alone, would have to fix it. In such instances, there was an opportunity for conversion. Skafidas also testified about how the bookkeepers in the vault sometimes left the safe open, with cash readily accessible. He noted that at least six people in the store could access the vault with their keys, and that the access keys were from time to time passed around to others in the store. There was also testimony by the defendant that strips of cash sent by the pneumatic tube system sometimes ended up at other cash registers instead of the vault.

At trial, the defendant flatly denied that she stole the $1,000, and said that she only signed the written confession and a restitution form because she was fearful and distraught.[2] The defendant stated that the paperwork relating to strips did not

---

[2]The defendant testified that one of her jobs before working at Home Depot was a counter manager at a restaurant. In that position, she had substantial responsibility for handling money. After she was terminated by Home Depot, she was rehired by the restaurant in the same capacity.

always come back from bookkeeping the same day, and that sometimes, she could not "balance [her] paperwork at the end of [her] shift." According to the defense, that there was not immediate reconciliation of the defendant's cash drawer on the day of the loss was important because had the paperwork from bookkeeping been reconciled with the cash transfers from the defendant's register at the end of her shift, there would have been a better chance of tracing the loss and demonstrating that it was not the defendant who took the money. On that point, Skafidas stated that when a cashier's register is short, the matter is addressed immediately with the cashier. That was not done here. Indeed, the defense notes that, consistent with her profession of noninvolvement in the missing $1,000, the defendant was allowed to run her register for five days after it was discovered that cash was missing. Given the absence of an immediate accounting of the defendant's cash drawer, there was only what the defense characterizes as a "delayed" investigation, which improperly and exclusively targeted the defendant, while leaving other potential suspects afoot.

As the foregoing makes clear, there was conflicting evidence, such that a rational jury could have found that a reasonable doubt existed whether the defendant was the person responsible for the theft since she was *not* the only person with access to the cash and the opportunity to take the money. The introduction of the defendant's confession dramatically moved the fault line for this divided evidence to the Commonwealth's side. In effect, the confession was a turning point.

2. *The conduct of the interrogation of the defendant.* The trial evidence concerning the manner in which the defendant's confession was obtained (again, evidence directly introduced before the jury without an evidentiary voir dire)[3] presented exceptionally divergent images of what transpired in the interview room during the interrogation of the defendant.

---

[3]That there were deeply conflicting descriptions of what transpired during the interrogation of the defendant conducted by the in-house private investigators was brought to the attention of the trial judge, who nonetheless declined to conduct a voir dire. At a colloquy with counsel concerning the issue, the judge stated that he would listen to arguments of counsel. (The judge had also refused to hold such a hearing pretrial, as requested by defense counsel.) At the colloquy, the statements of the prosecutor and defense counsel depicted widely divergent and conflicting descriptions of the circumstances surround-

On February 26, 2003, two investigators from Home Depot's loss prevention group, Jerry Serra and Tammy Esquivel, conducted the questioning of the defendant. There was evidence that this form of isolated interrogation of an employee by the loss prevention investigators did not conform with general company practices. Rather, according to testimony by Skafidas, during questioning of an employee concerning any such loss, it was company policy to have a manager present with the investigators.

The two investigators drew a picture before the jury of a low-key inquiry of the defendant. The investigators told the jury that there was no reason for the defendant to feel, nor did she appear to be, threatened or intimidated. According to the Home Depot investigators, the defendant "vented," but then ultimately broke down and made a full confession. There was, according to this version of the interview, absolutely no duress. Rather, it was made to appear by the investigators' testimony that the defendant confessed merely because the loss prevention investigators had focused on the defendant as the culprit responsible for the $1,000 in missing funds.

The defendant's description of the interview — which, as shall be seen, had corroborative support — was far different. The defendant described being ordered to leave her register at around 9:45 A.M. with no indication of the reason. She was led to a remote office and was confronted by two persons unknown to her. She was already feeling fearful. The room was small, and the defendant felt claustrophobic. One investigator, Serra, loomed over the defendant and, from time to time, seemed to make threatening gestures. The other investigator, Esquivel, blocked the door. The defendant asked, but was not allowed, to make a telephone call to her husband or to seek advice from a lawyer. It was suggested to the defendant by the investigators that if she were convicted of this theft, proceedings might be instituted by the Department of Social Services that could, in

ing the interrogation, including, but not limited to, the length of the interrogation, whether the defendant was held in the room and not allowed to leave, whether the door was blocked, whether the room was small and restrictive, and the extent to which the defendant appeared distressed. Notwithstanding this flagging that there was an issue concerning voluntariness and that the judge should hold an evidentiary hearing and enter a decision on the issue, the judge instead simply stated, "Well, it becomes an issue, really, for the jury."

turn, lead to the defendant's separation from her special needs child. In a recurring theme, the investigators told the defendant that she would be permitted to leave the room when and if she signed papers acknowledging her complicity in the theft.

At one point, Serra stormed out of the interrogation room, leaving Esquivel, who continued to pressure the defendant to sign the confession and restitution form admitting she had taken the money. According to the defendant, throughout the course of writing and editing the confession, as well as the execution of the restitution form, she continued to profess her innocence, which Esquivel brushed aside. The message conveyed was that the defendant would not be allowed to leave the room until the papers were signed.

Once the defendant had signed the confession and the restitution form, a human resources representative came in and terminated her employment. The defendant was hyperventilating, felt as if she could not breathe, and begged to be let out. Her interrogation had lasted nearly two hours.

That the defendant had been agitated and distressed during the interview and had "confessed" while under duress was corroborated by testimony from her husband. The husband described receiving a telephone call around 11:30 A.M. from his wife asking that he come get her. The defendant was upset and crying, and her husband rushed to the store. When he arrived at the store some twenty-five minutes later, the defendant was still upset, crying, hyperventilating, mumbling, and incoherent. Two hours passed before his wife calmed down.

Salvatore DiPasquale, a coworker of the defendant's husband, testified to the husband's receipt of the call from the defendant. DiPasquale stated that, based on what he overheard the defendant's husband saying, and from the tenor of the husband's side of the conversation, he concluded that the defendant was incoherent and her husband was trying to calm her down.

3. *Analysis.* We state the governing principles. Once a defendant has presented evidence that indicates that a defendant's confession or statements of admission that are sought to be admitted may not have been voluntarily given, the burden shifts to the Commonwealth to prove beyond a reasonable doubt that the statements were made voluntarily. See *Commonwealth* v. *Tavares,*

385 Mass. at 151-152. In this case, evidence concerning the oppressive nature of the interrogation, the threats, and the defendant's mental state all indicate a very real issue whether the confession to the Home Depot investigators was a voluntary statement.

The issue of voluntariness having thus been lodged, it is constitutionally required that before introduction of a defendant's statements amounting to a confession (or admission), the question whether the statements were voluntarily given is to be decided by the judge following an evidentiary hearing in the absence of the jury. *Ibid.* See *Commonwealth* v. *Girouard*, 436 Mass. 657, 658-659 (2002). Contrary to the government's contentions, the failure of a trial judge to conduct such an evidentiary voir dire or pretrial hearing is not cured by submitting the issue of voluntariness to the jury under the Massachusetts "humane practice" doctrine. See note 1, *supra*, which addresses the interrelation between the first stage (the Federal constitutional requirement that a judge make a preliminary determination of the voluntariness of a confession following a judicial hearing) and the second stage (jury reconsideration of voluntariness under the Massachusetts "humane practice").

At the evidentiary pretrial hearing or at the voir dire conducted during trial, the voluntariness of a confessional statement or admission is measured by "whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act." *Commonwealth* v. *Raymond*, 424 Mass. 382, 395 (1997), quoting from *Commonwealth* v. *Selby*, 420 Mass. at 663. A statement is voluntary if it is the expression of a "rational intellect" in its formulation and a "free will" in its expression. *Commonwealth* v. *Davis*, 403 Mass. 575, 581 (1988), quoting from *Blackburn* v. *Alabama*, 361 U.S. 199, 208 (1960). The central issue to be assessed is whether the interrogation exceeded permissible limits. "The limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." *Commonwealth* v. *Makarewicz*, 333 Mass. 575, 587 (1956), quoting from *Commonwealth* v. *Myers*, 160 Mass. 530, 532 (1894). Relevant

considerations include but are not limited to "(1) the time and conditions under which the questioning took place; (2) the content and form of the questions put to the defendant . . . ; and (3) the physical and mental condition of the defendant during the period during which he was questioned." *Ibid.*

It is only *if* the judge determines as a preliminary matter that the statement is voluntary that such statement may come into evidence. Otherwise, the statement is inadmissible and may not be presented to the jury. Further, even if the judge — following an evidentiary pretrial hearing or voir dire during trial — decides that a defendant's confession or admission is introducible, under the humane practice, the judge is then obliged to instruct the jury to make an independent determination of the issue and to "instruct the jury not to consider the confession if, upon the whole evidence in the case, they are satisfied that it was not the voluntary act of the defendant." *Commonwealth* v. *Tavares*, 385 Mass. at 150, quoting from *Commonwealth* v. *Marshall*, 338 Mass. 460, 461-462 (1959). See *Commonwealth* v. *Chung*, 378 Mass. 451, 456 (1979); *Commonwealth* v. *Benoit*, 410 Mass. 506, 512 (1991). See also note 1, *supra.*

These rules apply even when the confession is elicited by private individuals. Thus, here, even though the interview of the defendant was conducted by private investigators employed by Home Depot, State action that nonetheless may yield a constitutional violation is implicated by the use of potentially coerced testimony at trial, in violation of due process rights. See generally *Commonwealth* v. *Mahnke*, 368 Mass. 662, 681 (1975), cert. denied, 425 U.S. 959 (1976) (even if private actors exercise duress to force a confession, due process rights and protections are implicated in the State action of the introduction of the privately taken confession at trial). Accord *Commonwealth* v. *Paszko*, 391 Mass. 164, 172-183 (1984); *Commonwealth* v. *Zagrodny*, 443 Mass. 93, 99 (2004).

In this case, a fundamental constitutional principle designed to preserve the integrity of voluntarily made confessions was not followed. The error was not harmless.[4] There was no evidence taken out of the presence of the jury, and the judge listened only

---

[4] Preserved constitutional errors "are reviewed to determine whether or not they were harmless beyond a reasonable doubt, unless the constitutional right

to arguments of counsel. Thereafter, the judge, on what basis it is not clear since there was no evidence adduced or findings entered, simply stated, "the Commonwealth has proved beyond a reasonable doubt that the statement that was made was voluntary." Further, there was error in the judge's expressed view that contested points — including the length of the interrogation, the way in which it was conducted, the existence of implicit and explicit threats, and the defendant's state of mind in response to the interrogation — should be determined by the jury.

The judgment is reversed, the verdict is set aside, and the case is remanded for further proceedings.[5]

*So ordered.*

---

infringed is 'so basic to a fair trial that [its] infraction can never be treated as harmless error.' " *Commonwealth* v. *Vinnie,* 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998), quoting from *Chapman* v. *California,* 386 U.S. 18, 23 (1967). In the instant appeal, our review of the record convinces us that the defendant's motions and requests for a hearing on the voluntariness of the confession were sufficient to preserve the challenged error, and that the harmless error standard of appellate review governs. However, even were we to consider the judge's failure to hold a hearing and preliminarily rule on the voluntariness of the defendant's confession under the unpreserved error standard, reversal would still be compelled because the evidence in the trial record gives rise to "serious doubt whether the result of the trial might have been different had the error not been made," *Commonwealth* v. *LeFave,* 430 Mass. 169, 174 (1999), and "doubt that the [defendant's] guilt had been fairly adjudicated." *Commonwealth* v. *Amirault,* 424 Mass. 618, 647 (1997). See *Commonwealth* v. *Alphas,* 430 Mass. 8, 13 (1999).

[5]The appeal in this case, as previously noted, is largely directed to the failure of the trial judge to conduct an evidentiary voir dire regarding the defendant's confession. Lurking below the surface, and not fully briefed, is an underlying related issue, i.e., whether the defendant's trial counsel pursued a motion to suppress the confession based on coercion negating the voluntariness of the statement. Trial counsel filed a motion to suppress. The suppression motion, however, appears mostly directed to the issue whether Miranda warnings should have been given. See *Miranda* v. *Arizona,* 384 U.S. 436 (1966). On July 18, 2003, a judge (not the trial judge) denied the motion with the following endorsement: "Denied as a matter of law. [N]o state action." As to the lack of an obligation to give Miranda warnings by private actors, this ruling is correct.

However, there is confusion because while the suppression motion, in the

main, addresses the Miranda issue, the motion also references *Commonwealth v. Tavares*, 385 Mass. at 145, and raises issues of voluntariness. To the extent the suppression motion was meant to raise the issue that suppression was warranted because the confession was involuntary, the argument is most inartfully framed. In any event, to the extent the motion was supposed to raise the issue, there was, as noted, no pretrial suppression hearing on voluntariness of the confession, and no direct pretrial ruling on that aspect of the motion.

Adding to the confusion is the fact that the defendant filed a second pretrial motion, entitled "Motion for Evidentiary Hearing," on the same day as the aforesaid suppression motion. The second motion references the "Humane Practice Doctrine" and requests an evidentiary hearing. Whether this motion was supposed to be interrelated with the motion to suppress is unclear. On July 18, 2003, this evidentiary hearing motion was allowed by the same judge who denied the suppression motion. However, no such evidentiary hearing was held.

The result of it all is that, from the docket, the endorsements on the motions, the trial proceedings, and the parties' appellate briefs, we cannot reconstruct whether a motion to suppress on the ground of an involuntary confession was not fully pursued, or was pursued but then was waived, or whether there was ineffective assistance of counsel in these respects. From all that we can discern, it may be that a motion to suppress challenging the confession as having been involuntarily given may still be an open issue. On this record, we are unable to further determine whether the suppression motion is still viable, and whether there are questions of waiver. Further proceedings in the District Court following remand are needed to clarify the issue.