## COMMONWEALTH *vs.* HENRY R. ARIAS.

No. 10-P-402.

Suffolk. February 1, 2011. - February 28, 2012.

Present: GRASSO, McHUGH, & WOLOHOJIAN, JJ.

*Practice, Criminal,* Motion to suppress, Admissions and confessions, Voluntariness of statement, Hearsay, Confrontation of witnesses. *Search and Seizure,* Protective frisk, Reasonable suspicion, Consent, Motor Vehicle. *Constitutional Law,* Stop and frisk, Reasonable suspicion.

A Boston Municipal Court judge erred in denying a criminal defendant's motion to suppress a firearm and ammunition discovered in an automobile when, after conducting a patfrisk of the defendant based on a tip provided by unknown informants, police officers obtained the defendant's consent to search the vehicle, where, in the absence of any police corroboration of the unknown informants' tip, the stop of the defendant was impermissible, and the record did not show sufficient attenuation (i.e., the police did not advise the defendant of his right to refuse consent, no significant time elapsed between the stop and the consent, and no intervening event occurred) of the illegal search and the illegal seizure of the defendant to warrant a finding that the defendant's consent was an act of free will, unaffected by the taint of the illegality. [347-351]
Discussion of issues likely to arise at retrial of a criminal complaint concerning the erroneous admission of hearsay testimony in violation of the defendant's right to confrontation under the Sixth Amendment to the United States Constitution. [351-352]

COMPLAINT received and sworn to in the Central Division of the Boston Municipal Court Department on May 30, 2008.

A pretrial motion to suppress evidence was heard by *Sally A. Kelly,* J., and the case was tried before *Michael J. Coyne,* J.

*Nelson P. Lovins* for the defendant.

*Danielle Walsh (Kathleen Celio,* Assistant District Attorney, with her) for the Commonwealth.

McHUGH, J. Following a jury trial, Henry R. Arias, the defendant, was convicted of carrying a firearm without a license in violation of G. L. c. 269, § 10(*a*), and of possession of am-

munition without a license in violation of G. L. c. 269, § 10(*h*). On appeal, he argues that a judge of the Boston Municipal Court erred in denying his motion to suppress physical evidence. He also argues that the trial judge, another judge of the Boston Municipal Court, erred in failing to conduct an evidentiary hearing on the issue of "voluntariness" of statements the defendant made to police and erroneously allowed introduction of hearsay testimony.[1] We reverse.

1. *Motion to suppress.* a. *The record and the findings.* Three witnesses, the defendant, Massachusetts Bay Transportation Authority (MBTA) police Sergeant Detective John Mahoney, and MBTA police Detective Patrick Lewis, testified at the hearing on the defendant's motion to suppress. Before reciting the motion judge's findings, we summarize the testimony "that was 'uncontroverted and undisputed and [that] the judge explicitly or implicitly credited.' " *Commonwealth* v. *Ocasio*, 71 Mass. App. Ct. 304, 305, cert. denied, 555 U.S. 931 (2008), quoting from *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007).[2]

On the morning of May 29, 2008, Sergeant Detective Mahoney, who was in charge of the MBTA's internal security unit, received a telephone call from Richard Hart, the MBTA's manager of station maintenance with a supervisory responsibility over the MBTA's contract cleaners. Hart said he had "received information" from an unnamed source or sources that "there was a contract cleaner, the foreman, who works at North Station [in Boston] that was carrying a gun while working on the property and possibly, that he may have two guns and he was known to carry one in the . . . small of his back and possibly one in his car." According to Hart, the foreman's name was Arias and

---

[1] He also argues that the judge should have allowed his motion for a required finding at the close of the Commonwealth's case. At that stage, though, the evidence, viewed in the light most favorable to the Commonwealth, was sufficient to allow the case to proceed. See generally *Commonwealth* v. *Kater*, 432 Mass. 404, 410 (2000).

[2] In urging affirmance of the judge's denial of the motion to suppress, the Commonwealth also relies on testimony presented by its witnesses at trial. We do not see a material difference between the testimony at the suppression hearing and at trial, but to the extent that there is a difference, we do not rely on trial testimony in reviewing a motion to suppress. See *Commonwealth* v. *Deramo*, 436 Mass. 40, 43 (2002).

he "drove a BMW [automobile], silver and blue, with no license plate." Sergeant Detective Mahoney "informed Officer Lewis of the information he had received, gave him Mr. Hart's phone number and told him to call [Hart] back and get all pertinent information that he could from him."

Officer Lewis contacted Hart and another MBTA employee named Halloran, who also had a supervisory role over contract cleaners. Without identifying the sources of their information, Hart and Halloran told Officer Lewis that "other people"[3] had informed them that the defendant, one of the contract cleaners, "may be in possession of a firearm." They then provided Lewis with information regarding the defendant, including his name, where he worked, the type of vehicle that he had been seen driving, his date of birth, and "stuff like that based on his employment records." Hart and Halloran also told Officer Lewis that the defendant's shift was from 11:30 P.M. to 7:30 A.M., and that contract cleaning supervisors like the defendant were required to report to an MBTA office at Downtown Crossing in Boston at approximately 11:00 P.M. before going to their assigned work locations.

Relying on the information provided to him by Hart and Halloran, but without ascertaining the identities of or speaking to the "other people" from whom Hart and Halloran had obtained their information, Sergeant Detective Mahoney went to Downtown Crossing at 11:00 P.M. There he saw a parked silver and blue BMW. From the license plate on the vehicle, he learned that the car was registered to a woman who lived at an address that matched the address for the defendant Hart had provided. A search of other records revealed that the defendant had not been issued a firearms license.

So informed, Sergeant Detective Mahoney, Officer Lewis, and a third MBTA police officer, Detective Michael Cauley, proceeded to North Station where they saw the BMW parked and unoccupied on an access road. Sergeant Detective Mahoney and Officer Lewis parked fifty to sixty yards away in an un-

---

[3]Covered by a protective order the motion judge issued, the "other people" were not identified at the hearing, although it is clear that by the time of the hearing the officers knew their names and addresses.

marked cruiser, while Detective Cauley waited and watched from another location.

At some point between 11:30 P.M. and 1:00 A.M., the officers saw the defendant come out of a nearby building, walk to the BMW, and open either the passenger side door or the trunk several times. Around 1:00 A.M., the defendant returned to the car, opened the passenger door, and sat down in the passenger seat to put on work boots. At that point, Sergeant Detective Mahoney approached him, with Officer Lewis close behind. Sergeant Detective Mahoney displayed his badge, and the officers identified themselves as MBTA police. The officers were in plain clothes, and although armed, they did not draw their weapons.

Sergeant Detective Mahoney testified that, as he drew near, he asked to speak to the defendant. "At that time, he stood up. I informed him that we had information that there was a gentleman that worked there carrying a firearm and was the foreman of the crew. I told him for his safety, I was just going to do a pat down of him. He nodded his head affirmatively. I patted him down and found no other firearm. And then we asked if we could search the vehicle."[4] The defendant said, "[Y]es," or "[Y]es, go ahead," or "[Y]es, you may," or "[G]o ahead, search the car. You can search the car."

Officer Lewis and Detective Cauley then began to search the defendant's car. Officer Lewis found a loaded pistol beneath a floor mat under the driver's seat and "yelled 'gun.' " Upon hearing that, the defendant immediately said, "I found it." In response, Sergeant Detective Mahoney asked, "[W]hat did you say?" to which the defendant responded, "I found it. I saw a gentleman running down Causeway Street and he threw something down. I went over to see what it was and when I picked it up, it was the gun. And I was going to call the police but I didn't. I just put it in the car."[5]

The defendant was then handcuffed and Officer Lewis walked

---

[4]Officer Lewis's testimony was to the same effect: "At that time, we explained to him the reason why were talking to him which was that we had received reports that he may be in possession of a firearm at what point, we asked him to stand up and if he was willing — we gave him a pat frisk."

[5]Officer Lewis testified that the defendant made that statement after he had been handcuffed but before receiving any Miranda warnings.

him to a nearby cruiser, reciting the Miranda warnings as he did. The defendant "acknowledged" the warnings.[6] Officer Lewis placed him in the cruiser's rear seat and then asked him "what happened," whereupon the defendant essentially repeated the account he had given in response to Sergeant Detective Mahoney's question.

On that record, the motion judge denied the defendant's motion to suppress with the following oral findings:

> "After a hearing and based on the credible evidence, this Court makes findings and rulings which include but are not limited to the following. The Defendant . . . admits he had a firearm loaded with ammunition in his motor vehicle. He argues that the police violated his right to be free from illegal search and seizure under the Fourth and Fourteenth Amendment of the United States Constitution and Article 14 of the Massachusetts Declaration of Rights when the police located that loaded firearm by searching his motor vehicle without a warrant and without his permission.

> "Because this Court credits the testimony of Sergeant Detective John Mahoney and Detective Patrick Lewis, that the Defendant while not under arrest, consented to the search of his motor vehicle which resulted in the discovery of the firearm and ammunition, the Defendant's motion to suppress is denied.

> "The Defendant had a firearm loaded with ammunition in his car. The police had good intelligence that the Defendant may have a firearm or firearms. The police made a threshold inquiry of the Defendant and told him they had information that he may have a gun. The police pat frisked the Defendant for their safety. The police asked the Defendant if they could search his car. The Defendant consented to the search. Detective Lewis Mirandized the Defendant orally, properly, after the firearm was located.

> "The Defendant made statements after Miranda which include but are not limited to that he found the gun and

---

[6]The defendant is from the Dominican Republic and English is not his native language, though he has been in this country for ten years.

put it in his car. The Court notes that additional findings and rulings will be made upon the filing of a Notice of Appeal.''[7]

b. *Discussion.* On the record just described, the defendant argues that the Commonwealth has not satisfied its burden of proving that any consent he may have given for the search of his vehicle[8] was untainted by what he characterizes as the unlawful stop and frisk by which it was preceded. We agree. In so doing, we accept the motion judge's findings of fact absent clear error, but we independently review her conclusions of law. See *Commonwealth* v. *Washington*, 449 Mass. 476, 480 (2007).

"[A] 'stop and frisk [is] constitutionally permissible if two conditions are met. First, the investigatory stop must be lawful.' " *Commonwealth* v. *Narcisse*, 457 Mass. 1, 7 (2010), quoting from *Arizona* v. *Johnson*, 555 U.S. 323, 326 (2009). "Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Ibid.*

There can be no doubt that the defendant was "stopped" in a constitutional sense before the search of his vehicle occurred. A "stop" is a form of seizure, and a person is seized for purposes of the Fourth Amendment to the United States Constitution when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States* v. *Mendenhall*, 446 U.S. 544, 554 (1980). See *Commonwealth* v. *Stoute*, 422 Mass. 782, 785-789 (1996) (adopting the *Mendenhall* standard for art. 14 of the Massachusetts Declaration of Rights). In this case, those circumstances existed no later than the point at which Sergeant Detective Mahoney told the defendant that he intended to conduct a frisk.[9] See *Commonwealth* v. *DePeiza*, 449 Mass. 367,

---

[7]The record does not reflect that either party requested additional findings or that any were made.

[8]At the hearing, the defendant testified that consent to search the vehicle had been neither sought nor given and that the vehicle search and the frisk proceeded simultaneously. The motion judge rejected that testimony.

[9]The dispositive consequence of our conclusion means that it is unnecessary to decide whether a stop occurred at any earlier point in the encounter between the police and the defendant.

371 (2007); *Commonwealth* v. *Narcisse*, 457 Mass. at 6 ("once the officers told the defendant that they intended to pat frisk him, they seized his person within the meaning of the Fourth Amendment and art. 14").

A stop is lawful only if the police have "an objectively reasonable suspicion of criminal activity, based on specific and articulable facts." *Commonwealth* v. *Barros*, 435 Mass. 171, 176 (2001). When reasonable suspicion is based on an informant's tip, the tip must bear adequate indicia of reliability, i.e., "the Commonwealth must show the basis of knowledge of the source of the information (the basis of knowledge test) and the underlying circumstances demonstrating that the source of the information was credible or the information reliable (veracity test)." *Commonwealth* v. *Lopes*, 455 Mass. 147, 155-156 (2009).[10]

Here, the record reveals nothing about the informants' basis of knowledge or veracity. Hart and Halloran, the MBTA employees who told the police about the defendant, expressly stated that they were passing on information they had obtained from "other people" but said nothing about who the other people were and provided no information about the other people that would enable anyone to determine either their veracity or basis of knowledge. In that regard, we treat the individuals who gave information to Hart and Halloran as unknown informants even though police knew their identities by the time of the hearing. See note 3, *supra*. Nothing in the record suggests that the police knew who the informants were before they arrested the defendant or that they had any idea how the informants knew of the gun. Moreover, information obtained from known informants receives somewhat greater weight than that received from anonymous informants because known informants expose themselves to "charge[s] of filing a false report or any comparable consequence of providing false information to law enforce-

---

[10]Despite the fact that illegal firearms are a current social scourge, the fact that firearms are an ingredient of an informant's report neither slackens the reliability requirements nor itself provides "reasonable suspicion of criminal activity." *Commonwealth* v. *Alvarado*, 423 Mass. 266, 271, 273 (1996) (no reasonable suspicion "simply on a report of gun possession"). See *Commonwealth* v. *Gomes*, 458 Mass. 1017, 1017-1019 (2010) (no imminent threat to public safety despite 911 call that a man was holding a gun in the air on a public street).

ment." *Commonwealth* v. *Mubdi*, 456 Mass. 385, 397 (2010). See *Commonwealth* v. *Costa*, 448 Mass. 510, 515-517 (2007). Here, the informants faced no such consequences when they made their disclosures to Hart or Halloran. Indeed, nothing in the record suggests that they even knew that Hart or Halloran would relay their information to authorities.

When there is insufficient evidence to show an informant's basis of knowledge and veracity, "[i]ndependent police corroboration may make up for deficiencies in one or both of these factors." *Commonwealth* v. *Barros*, 435 Mass. at 176, quoting from *Commonwealth* v. *Lyons*, 409 Mass. 16, 19 (1990). Corroboration of that sort, though, must show that the informant has knowledge related to the criminal activity, not mere "innocent details." *Id.* at 177 n.7. See *Florida* v. *J.L.*, 529 U.S. 266, 272 (2000) (a tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person").

No such corroboration is present here. To be sure, Hart and Halloran told the police about the defendant's work schedule and the officers saw him appear at the times and places the schedule dictated.[11] But Hart and Halloran had supervisory responsibilities for contract cleaners like the defendant and surely would have known his work schedule, regardless of the knowledge or veracity underlying the original tips. In addition, Officer Lewis testified that some information Hart and Halloran provided came from employment records, and apart from information about the pistol, the record does not distinguish between the information coming from those records and information gained from the unknown informants. Moreover, police corroboration of informant information bolsters the reliability and veracity of that information to the extent that it tends to show the informant's knowledge of "inside activity" that has some relevance to the unlawful behavior the informants are reporting. See *Commonwealth* v. *Mubdi*, 456 Mass. at 397-398. Police corroboration of information in employment records, on

---

[11]They also verified Hart's and Halloran's information that the defendant would be driving a BMW. It is unclear whether that information originated with Hart and Halloran or with the others. In any event it was only partially accurate, for Hart and Halloran told police that the car did not have a license plate. When Sergeant Detective Mahoney saw the car, it did have a license plate and he used that plate to tie the vehicle to the defendant's address.

the other hand, tends to show accurate record keeping or faithful employment, not criminal activity.

The stop was therefore impermissible and the stop and frisk are analytically inseparable. Thus the question becomes whether the Commonwealth has satisfied its burden of showing that the defendant's consent to the automobile search was "free and voluntary," *Commonwealth* v. *Yehudi Y.*, 56 Mass. App. Ct. 812, 816 (2002), that is, "unfettered by coercion, express or implied, and . . . something more than mere 'acquiescence to a claim of lawful authority.' " *Commonwealth* v. *Voisine*, 414 Mass. 772, 783 (1993), quoting from *Commonwealth* v. *Walker*, 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976). "Consent to search obtained through exploitation of a prior illegality, particularly very close in time following the prior illegality, has not been regarded as freely given unless the taint of the illegality has been attenuated. . . . It is the burden of the Commonwealth to prove that the taint has been sufficiently attenuated to allow the admission of the evidence derived from the prior illegality." *Commonwealth* v. *Allen*, 54 Mass. App. Ct. 719, 721-722 (2002).

Insofar as dissipation of the taint is concerned, we think that this case is indistinguishable from *Commonwealth* v. *Loughlin*, 385 Mass. 60 (1982). There, after engaging in what the court determined to be an impermissible detention of a pickup truck driver and passenger and an impermissible patfrisk of the passenger, the officer asked the driver whether there were any weapons in the truck's passenger compartment. In response, the driver said, "No weapons. You can check." *Id.* at 62. The officer did and found nothing. He then asked whether there were any weapons in the back of the vehicle. Again the driver answered, "No, you can check." Again the officer searched, this time finding marijuana, which led to the charges on which the driver and passenger were convicted. *Ibid.*

In ruling that the search was impermissible, the Supreme Judicial Court stated, "The record does not show sufficient attenuation of the illegal search of [the passenger] and the illegal seizure of [the driver and passenger] to warrant a finding that [the driver's] consent was an act of free will, unaffected by the taint of the illegality. . . . The trooper did not advise [the driver] of his right to refuse to consent to the search. No

significant time elapsed between the illegality and the 'consent.' No intervening event occurred that dissipated the effect of the illegality." *Id.* at 63-64.

The same reasoning and result apply here.[12] On this record it was error to deny the motion to suppress. The firearm and the ammunition it contained should not have been admitted at trial, and no discussion is required to show that admission of either or both was not "harmless beyond a reasonable doubt." *Commonwealth* v. *Tyree*, 455 Mass. 676, 700 (2010), quoting from *Chapman* v. *California*, 386 U.S. 18, 24 (1967).

2. *Other claims.* The defendant's other claims require far less discussion. We need not resolve his claim that the trial judge should have held an evidentiary hearing on the voluntariness of his statements.[13] If there is to be a retrial and if the voluntariness of those statements remains a live issue, the voluntariness should be explored and a humane practice instruction given. See, e.g., *Commonwealth* v. *Cryer*, 426 Mass. 562, 571 (1998); *Commonwealth* v. *Miller*, 68 Mass. App. Ct. 835, 835 n.1 (2007).

Sergeant Detective Mahoney and Officer Lewis should not have been permitted to testify, over objection, that the defendant was known to carry a firearm and that he would be driving a blue and silver BMW from Downtown Crossing to North Station.[14] The testimony was hearsay, perhaps totem pole hearsay, as the officers received all of that information from Hart and Halloran, who did not testify and who received at least some of it from unnamed others. The Commonwealth agrees that "the admitted statements went beyond what was necessary to show the state of police knowledge." See *Commonwealth* v. *Rosario*, 430 Mass. 505, 507-512 (1999). Under those circumstances, admission of the testimony violated the defendant's right to confrontation under the Sixth Amendment to the United States

---

[12]Noteworthy in this regard is that the MBTA police have a consent form for vehicle searches. The officers, however, did not have a form with them that night, nor did they recite to the defendant the essence of what the form contains.

[13]The defendant did not file a motion to suppress those statements.

[14]The defendant unsuccessfully moved to exclude this evidence in a motion in limine. The defendant also objected to the admission of the testimony each time it was elicited during trial.

Constitution. See *Crawford* v. *Washington*, 541 U.S. 36 (2004). The error was not harmless, as the testimony bore on issues central to the Commonwealth's case and central to the defense.

*Judgments reversed.*