COMMONWEALTH *vs.* SARAYA SIM.

No. 94-P-511.

Essex. March 22, 1995. - August 31, 1995.

Present: BROWN, JACOBS, & IRELAND, JJ.

*Homicide. Joint Enterprise. Constitutional Law*, Admissions and confessions, Waiver of constitutional rights. *Evidence*, Admissions and confessions, Redirect examination. *Waiver. Practice, Criminal*, Voluntariness of confession.

Evidence at a criminal trial was sufficient to warrant the defendant's convictions on two indictments for armed robbery on a theory of joint venture and on an indictment for murder on the theory of felony-murder with respect to the killing that occurred in the course of the robbery. [215-218] BROWN, J., concurring.

Evidence at the first trial of indictments for armed robbery and murder was sufficient to warrant findings of guilty and, after a mistrial, the defendant's motion to dismiss the indictments before retrial, on double jeopardy grounds, was correctly denied. [218]

At a criminal trial, the judge correctly denied the defendant's motion to suppress certain statements he had made to police, where the judge found, on the basis of the evidence presented, that the defendant's first two interviews with police were not custodial in nature, thus Miranda warnings were not required, and that the defendant had made a knowing, intelligent and voluntary waiver of his Miranda rights during a third interview five days later, following which he voluntarily made statements. [218-223]

At the trial of indictments the scope of the prosecutor's examination on redirect was properly within an area first opened on cross-examination. [223]

INDICTMENTS found and returned in the Superior Court Department on March 20, 1991.

A pretrial motion to suppress evidence was heard by *John C. Cratsley*, J.; a motion to dismiss was heard by *Patti B. Saris*, J.; and the case was tried before *Margot Botsford*, J.

*Matthew H. Feinberg* for the defendant.

*Susanne Levsen*, Assistant District Attorney, for the Commonwealth.

JACOBS, J. The defendant's first trial on indictments charging him with murder in the first degree and two counts of armed robbery ended in a mistrial when the jurors were unable to reach a verdict. That trial was preceded by the denial, after a hearing, of the defendant's motion to suppress certain statements made by him to police officers. When the Commonwealth announced its decision to seek a retrial, the defendant filed a motion to dismiss, relying on *Berry* v. *Commonwealth*, 393 Mass. 793 (1985), and alleging that a retrial would subject him to double jeopardy since there had been insufficient evidence to support a conviction in the first trial. The judge who presided at the first trial denied the motion after a hearing. The second trial in the Superior Court before another judge resulted in jury verdicts of guilty of murder in the second degree and two counts of armed robbery, following which the defendant was sentenced to three concurrent terms of life imprisonment. He appeals from the denial of his motion for a required finding of not guilty at the close of the Commonwealth's case in the second trial and from the denial of his motions to suppress and to dismiss.[1] He also raises an evidentiary issue. We conclude there was sufficient evidence to support a conviction in each of the trials, that the motion to suppress properly was denied and that there is no merit to the evidentiary claim. Consequently, we affirm.

The evidence at the second trial,[2] viewed in the light most favorable to the Commonwealth, *Commonwealth* v. *Lati-*

---

[1] In the circumstances, the defendant was entitled to review of the denial of his motion to dismiss by a single justice of the Supreme Judicial Court pursuant to G. L. c. 211, § 3. *Fadden* v. *Commonwealth*, 376 Mass. 604, 606 (1978), cert. denied, 440 U.S. 961 (1979). *Ventresco* v. *Commonwealth*, 409 Mass. 82, 85 (1991). *Koonce* v. *Commonwealth*, 412 Mass. 71, 72 (1992). There is no indication in our record that this "appropriate procedure" was pursued. See Smith, Criminal Practice & Procedure § 1303 (2d ed. 1983 & Supp. 1995). No argument is raised that failure to pursue that procedure constitutes waiver of the sufficiency of the evidence issue in the first trial. In any event, the same issue is presented to this court by the defendant's appeal from the denial of his motion for a directed verdict in the second trial. See note 2, *infra*. See *Neverson* v. *Commonwealth*, 406 Mass. 174, 176 n.2 (1989).

[2] The parties have indicated in their respective briefs that the evidence was essentially the same at both trials with the exception of an added pros-

*more*, 378 Mass. 671, 676-677 (1979), permitted the jury to find the following facts. On February 2, 1991, the defendant, Vann Long, and Oeun Lam[3] met in Lowell and made plans to rob the Nhor family at their apartment on the second floor of 102 Hanover Street, Lynn, where they believed the Nhors kept gold jewelry. The defendant, who lived on the first floor apartment at that address with his girlfriend, Kun Vorn, and her two children, expected to receive some of the proceeds of the robbery. About midnight of February 2, 1991, the defendant picked up Vorn and her children at her sister's apartment in Lowell where he had previously left them and proceeded in his Datsun automobile to their apartment in Lynn. Lam and Long followed them in a Toyota automobile. Along the way, the defendant told Vorn that Lam and Long were going to commit a robbery. When the defendant arrived on Hanover Street, he left his vehicle and walked to the Toyota in which Lam and Long were riding and indicated to them where to park. At some point that night, the defendant saw a gun in the Toyota. He and Vorn and her children then proceeded to the front entrance of 102 Hanover Street, followed by Lam and Long. The defendant unlocked the door, whereupon the group, including Lam and Long, entered the common hallway on the first floor of the building. After the defendant, Lam, and Long spoke among themselves, the defendant walked out of the apartment building and drove off in his car. At that point, Lam and Long put a gun to Vorn's

---

ecution witness at the second trial whose testimony did not add significantly to the Commonwealth's case. Our record does not include the transcript of the first trial, but the findings of the judge with respect to the motion to dismiss support the conclusion that the only evidence in the first trial that was not introduced in the second trial consisted of testimony that the defendant emerged from his apartment dressed in pajamas sometime after the murder, stating that he had been in bed. Those differences are of no moment, since the defendant challenges the sufficiency of the evidence only with respect to the "presence" requirement in joint venture.

[3] Both Long and Lam were convicted of murder in the first degree, armed assault in a dwelling, and two counts of armed robbery. Decisions with respect to their appeals appear in *Commonwealth* v. *Vann Long*, 419 Mass. 798 (1995) (judgments reversed because of error in jury empanelment process), and *Commonwealth* v. *Oeun Lam*, 420 Mass. 615 (1995) (judgments affirmed).

head, forced her to go upstairs and knock on the door of the Nhor apartment. When the door opened, Lam and Long entered and proceeded, at gunpoint, to rob the occupants. A struggle ensued during which Lam fired a shot which wounded one member of the Nhor family and killed another. After the shooting, Lam and Long ran from the apartment, leaving a gun with Vorn which she threw into the back yard. The robbers then fled in the Toyota, which was driven by someone other than the defendant.

The shooting and robbery occurred shortly after 1 A.M. on February 3, 1991. Police officers, who were in the neighborhood, received a radio message at 1:08 A.M. and were at the crime scene within a minute. The defendant was not within the building at 102 Hanover Street when the robbers entered the upstairs apartment, when the shot was fired, or when the police came. He was observed on the first floor of 102 Hanover Street approximately five minutes after the police had arrived. At that time, the defendant told a police officer he had just returned home and had not observed anything. No one saw the defendant return to 102 Hanover Street. A photograph of the defendant's vehicle taken less than two hours after the shooting indicates it was parked on the same side of Hanover Street as earlier when he drove it to the apartment, but pointing in the opposite and "wrong" direction. After being interviewed at a police station, the defendant told an interpreter, "I told them to rob only, not to hurt anybody," and that he did not know why they shot one of the victims.

1. *Sufficiency of the evidence.* The case against the defendant was presented on the basis of his being a joint venturer with Lam and Long in the armed robberies committed by them and on the theory of felony-murder with respect to the killing that occurred in the course of those robberies. The well-established test for joint venture is "whether [the] defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth v. Bianco*, 388 Mass. 358, 366, *S.C.*, 390 Mass. 254 (1983).

See also *Commonwealth* v. *Mandile,* 403 Mass. 93, 99-100
(1988); *Commonwealth* v. *Talbot,* 35 Mass. App. Ct. 766,
772 (1994). "Once it is determined that a defendant is a
joint venturer in a felony and that a homicide occurred in the
commission or attempted commission of that felony, complic-
ity in the underlying felony is sufficient to establish guilt of
murder in the first or second degree (see G. L. c. 265, § 1) if
the homicide followed naturally and probably from the car-
rying out of the joint enterprise." *Commonwealth* v. *Ambers,*
370 Mass. 835, 839 (1976). See also *Commonwealth* v.
*Cook,* 419 Mass. 192, 205 (1994).

The defendant challenges the adequacy of the evidence
only with respect to the "presence" requirement for joint
venture. He argues that at the moment he left the premises
at 102 Hanover Street, no armed robbery had been commit-
ted and that the evidence, while perhaps establishing his
complicity in the uncharged crimes of conspiracy to commit,
and accessory before the fact of, armed robbery, was insuffi-
cient to convict him as a principal in the crimes of armed
robbery or felony-murder.

In arguing that we should conduct our review on the as-
sumption that his last involvement with the crimes charged
occurred when he unlocked the door at 102 Hanover Street
and left the premises, the defendant takes a conveniently my-
opic view of the case, ignoring evidence of complicity stem-
ming from his quick return to the scene and the change in
the direction in which his vehicle was headed together with
the reasonable inferences that may be drawn from that
evidence.

A joint venturer has been defined as "one who aids, com-
mands, counsels, or encourages commission of a crime while
sharing with the principal the mental state required for the
crime." *Commonwealth* v. *Soares,* 377 Mass. 461, 470, cert.
denied, 444 U.S. 881 (1979). See also *Commonwealth* v.
*Stewart,* 411 Mass. 345, 350 (1991). Here, the evidence of
shared purpose is overwhelming and readily could support
the inference that the defendant's quick return to the scene
and the positioning of his car was for the purpose of making

himself available to aid the robbers, if necessary. Escape is an element incident to the crime of robbery. *Commonwealth v. Dellelo*, 349 Mass. 525, 529-530 (1965). See also *Commonwealth v. Green*, 302 Mass. 547, 555 (1939). Our courts have been expansive in their treatment of the presence requirement with respect to activities of an alleged joint venturer which reasonably might be viewed as undertaken with the intention of facilitating escape by the principal felon. See *Commonwealth v. Mahoney*, 405 Mass. 326, 329 (1989) (the defendant's presence, from time to time between 1 A.M. and 5 A.M. in the general vicinity where her husband broke into and entered a building, coupled with a statement which could have been found to evince a consciousness of guilt, was sufficient to establish that she was a joint venturer and active participant in the crime); *Commonwealth v. Amaral*, 13 Mass. App. Ct. 238, 243-244 (1982) (this court declined "to rule that a distance described only as 'several blocks' is, as matter of law, so far removed from the scene of the actual crime as to preclude an inference that the defendant participated in the crime of which she inferentially had knowledge").

"[I]f one is, by agreement, in a position to render aid he is an abettor even if he does not participate in the actual perpetration of the crime because his presence may encourage the perpetrator by giving him hope of immediate assistance." *Commonwealth v. Casale*, 381 Mass. 167, 173 (1980). It reasonably may be inferred that the defendant, when he returned, did not know that the robbers had left the scene, and thus thought that he might be of assistance. Inferences permitted to a jury "need only be reasonable and possible and need not be necessary or inescapable." *Ibid.* It is left to the jury to resolve conflicting reasonable inferences. *Commonwealth v. Longo*, 402 Mass. 482, 487 (1988). Our conclusion that the evidence was sufficient finds further support in the inconsistent statements originally given by the defendant to the police which may be construed as consciousness of guilt. See *Commonwealth v. Mahoney, supra* at 329.

Moreover, the defendant's activities at the time of his return to the scene should not be viewed in isolation, but must be considered with evidence of his planning the robbery, leading the robbers to the victims, directing the position of the Toyota, unlocking the door to 102 Hanover Street, and his expectation of sharing in the proceeds of the robbery. In that context, an inference plausibly may be drawn "that there was an agreement for the defendant to stand by, at or near the scene of the crimes to render aid, assistance or encouragement to the perpetrators if it became necessary, or to assist them in making their escape from the scene." *Commonwealth* v. *Perry*, 357 Mass. 149, 151 (1970).[4] Contrast *Commonwealth* v. *Lombard*, 419 Mass. 585, 590 (1995) ("There was no evidence . . . which might have given rise to an inference of knowledge of [the perpetrator's] plans on the part of the defendants").

As noted earlier (see note 2, *supra*), the evidence in the second trial, which we determined was sufficient, was substantially the same as that presented in the first trial. It follows that the evidence presented in the earlier trial was "legally sufficient to warrant a conviction." *Cramer* v. *Commonwealth*, 419 Mass. 106, 109 (1994). The defendant's motion to dismiss the indictments filed prior to the second trial on double jeopardy grounds, see *Berry* v. *Commonwealth*, 393 Mass. at 798, therefore, was properly denied.

2. *The motion to suppress.* The defendant claims that certain statements made by him at the Lowell police station during the early morning of February 3, 1991, were involuntary and the product of custodial interrogation, in violation of his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966). He also argues that later statements made on Febru-

---

[4] Accordingly, we need not address the approach taken by the judge in her decision denying the motion to dismiss. She opined that a defendant can be found guilty of a joint venture by rendering assistance immediately before the commission of the crime.

ary 8, 1991, were the tainted product of the February 3 illegalities.[5]

A judge (the motion judge), other than those who presided over the trials heard the motion to suppress and made comprehensive and detailed factual findings which we summarize. Shortly after the robbery and shooting, the defendant and several other persons voluntarily accompanied police to the police station where they were left alone in the roll call area. A police detective later spoke with the defendant in the presence of the others. During that time, the defendant was free to roam about. At 4:08 A.M., two police officers in civilian clothes began to interrogate the defendant in an interview room. The defendant told the officers that the robbers had followed him from Lowell and forced him to open the front door of his Lynn house. He was unclear as to when he became aware of their intent to rob. Concluding that an interpreter was necessary, the officers suspended the interview. The defendant again was free to roam about. At 5:52 A.M., the interview was resumed with the benefit of an interpreter. At this point, the interview was tape recorded, and the defendant, for the first time, was read his Miranda rights when an interpreter translated into Cambodian a card containing the Miranda rights in English.[6] When the officers determined that the defendant understood and waived those rights, they continued the interview through the interpreter. At the end

---

[5]The defendant makes no issue of statements taken by police at the crime scene or an unsolicited statement made by the defendant to an interpreter.

[6]The interpreter was connected with the victim witness program conducted by the Essex County district attorney. While we agree with the motion judge's observation that the interpreter's "attempt at translating the *Miranda* warnings into Cambodian (Khmer) was less than exemplary," that failing is immaterial in light of our concurrence with the motion judge's determination that the February 3 interviews were not custodial and that Miranda warnings, at that time, were unnecessary. For a discussion of the need for qualified interpreters, see Supreme Judicial Court Commission to Study Racial and Ethnic Bias in the Courts, Equal Justice 33-53 (1994). Compare *Commonwealth* v. *Bui*, 419 Mass. 392, 396 (1995) ("[a]fter an interpreter in Vietnamese repeated Miranda warnings that a State trooper read in English, the defendant signed a card with Miranda warnings written in Vietnamese . . .").

of this interview,[7] which produced no additional significant information, the police officers asked the defendant to accompany them to Lowell to continue the investigation. The defendant agreed, and after visiting several locations in Lowell and identifying Long from a "mug" book, was returned by the police to his home sometime in the afternoon of February 3, 1991.

On February 8, 1991, the defendant again volunteered to go to the Lynn police station where he was interviewed through another interpreter who advised him of his constitutional rights in Cambodian by reading from a "Cambodian Miranda card." After indicating that he understood his rights and that he was willing to speak to the officers, the defendant made some inculpatory statements, whereupon he was arrested. Later, when alone with the interpreter, he volunteered additional inculpatory information.

After applying the analysis set forth in *Commonwealth* v. *Bryant*, 390 Mass. 729 (1984),[8] the motion judge concluded that the 4:08 A.M. interview "did not constitute custodial interrogation and that, therefore, *Miranda* warnings need not have been given" to the defendant. Noting that the defendant came willingly to the police station, was allowed to roam

---

[7]The findings of the motion judge can be read as indicating that the interview which started at 5:52 A.M. lasted until 7:35 A.M. The record indicates that interview ended at approximately 6:41 A.M. and that another recorded interview was conducted from 7:20 A.M. until 7:37 A.M. We treat the motion judge's references to the 5:52 A.M. interview as encompassing both of those recorded interviews.

[8]A court must engage in a "subjective inquiry — whether, from the point of view of the person being questioned, the interrogation took place in a coercive environment — by reference to objective indicia." *Commonwealth* v. *Bryant, supra* at 736. The factors to be considered are "(1) the place of the interrogation; (2) whether the investigation has begun to focus on the suspect, including whether there is probable cause to arrest the suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the suspect; and (4) whether, at the time the incriminating statement was made, the suspect was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave. . . ." *Id*. at 737. See *Berkemer* v. *McCarty*, 468 U.S. 420, 442 (1984) ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation").

about, and was not told he was required to stay, the judge determined that the defendant "had many opportunities to walk away if he wished," and that he knew he was free to leave. He further noted there was "no evidence that the officers were overly aggressive in interviewing" the defendant and concluded that while the officers viewed the defendant with "cautious suspicion,"[9] their "investigation had yet to focus" when they began the 4:08 A.M. interview. Lastly, he observed that the February 3 interview did not result in the arrest of the defendant. Assessing these factors together, he concluded that the defendant's "freedom to leave was not sufficiently curtailed so as to require *Miranda* warnings." He, therefore, denied the motion to suppress any statements made by the defendant at the 4:08 A.M. interview.

On similar grounds, the motion judge also decided that the 5:52 A.M. interview was noncustodial and, therefore, that the Miranda warnings given to the defendant were not necessary, and no suppression of his statements was required. He further concluded, on the basis of listening to the interview tapes, that the 5:52 A.M. interview was not aggressive notwithstanding the officers' persistence in questioning after the defendant complained of hunger and a headache.

Recognizing the Commonwealth's heavy burden, in the circumstances, of proving lawful waiver of the right to remain silent, see *Commonwealth* v. *Doucette*, 391 Mass. 443, 448 (1984), the judge also concluded that the defendant made a knowing, intelligent and voluntary waiver of his Miranda rights during the February 8 interview and that his statements during and after that interview were voluntary beyond a reasonable doubt and, therefore, not to be suppressed.

---

[9]The judge also found that one of the officers conducting the 4:08 A.M. interview suspected that the defendant somehow might have been involved in the crimes. There is no indication in the record that such suspicion was communicated to the defendant. "It is well settled . . . that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*." *Stansbury* v. *California*, 114 S. Ct. 1526, 1529-1530 (1994).

Our review of the transcript of the motion hearing reveals that the motion judge's subsidiary findings are supported by the evidence and are not clearly erroneous. They, therefore, are to be accepted. See *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), and cases cited. Also, the conclusions drawn therefrom, while subject to reexamination, are entitled to substantial deference. *Commonwealth* v. *Doucette, supra* at 447-448.

The defendant grounds his claim of error on evidence not alluded to by the motion judge in his written findings such as the small size and bleakness of the interview room, the relative height and weight of the officers and the defendant, the unholstering of a gun by one of the officers during the interview, and the defendant's nervousness and difficulty in understanding and speaking English. The judge apparently took into account the physical characteristics of the interview room when he noted that the interrogation took place in the "detective's room" and that this fact by itself did not create a coercive environment. The evidence also indicates that the display of the gun was undertaken in an effort to assist the defendant in describing the gun he saw in the Toyota and not to intimidate him.[10] Also, the judge, by listening to the tape of the 5:52 A.M. interview and by his specific findings that the translations of the Miranda rights during the February 8 interview and the Cambodian Miranda card used "were accurate and adequate" and that the defendant "understood his rights," indicated appropriate sensitivity to the defendant's language difficulties and his physical and emotional condition during the interrogations.[11] We concur with the judge's conclusions drawn from the totality of the circumstances, see

---

[10]The transcript of the 5:52 A.M. interview indicates that the defendant, in response to a question as to what type of gun he saw, answered that it was similar to a police gun, but shorter. At that point, one of the interviewing officers apparently showed the defendant his gun and asked "[i]s it like this gun?"

[11]With respect to police questioning of the defendant at the scene of the shooting, not here in issue, the motion judge noted the testimony of a witness regarding the "death camp" mentality of certain Cambodians, and their inability to defy authority. Although he found this testimony "generally credible," he concluded that the February 3 circumstances did not

*Commonwealth* v. *Mahnke*, 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 959 (1976), that the February 3, 1991, interviews did not constitute custodial interrogation and that the defendant's waiver of rights and his February 8, 1991, statements were voluntary. In view of our determination that the February 3 interviews were proper, we need not address whether they tainted the February 8 interrogation.

3. *Evidentiary issue.* After Kun Vorn testified for the prosecution under a grant of immunity, defense counsel, on cross-examination, elicited testimony that could be construed as establishing that the witness did not tell the police the "whole truth" when she first spoke to them after the robbery and shooting.[12] On redirect examination, the prosecutor, over objection, was permitted to examine briefly concerning the differences between the witness's initial statement to the police and her trial testimony and the circumstances under which the earlier statement was made. This was permissible exploration on redirect examination of an area first broached on cross-examination. See *Commonwealth* v. *Otsuki*, 411 Mass. 218, 236 (1991); *Commonwealth* v. *Johnson*, 412 Mass. 318, 325 (1992). Contrary to the defendant's argument, it was not improper impeachment.

> *Judgments affirmed.*
> *Orders denying the motions to suppress and to dismiss affirmed.*

BROWN, J. (concurring). When the chaff is separated from the wheat, the conclusion is inescapable that the defendant was a joint venturer. He "encourage[d] commission of a crime while sharing with the principal[s] the mental state re-

---

lead the defendant "to believe that he was required to answer or could not leave at [that] point."

[12]DEFENSE COUNSEL: "Now, after that night when you went to the police . . . you didn't tell them the whole truth . . . did you?"

WITNESS: "That time because I was so scared, I just spoke to them and then afterwards I forgot."

quired for the crime." *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). He also agreed to share in the proceeds. Once it is determined (as we do here) that the defendant is a joint venturer, he becomes culpable for the misdeeds that followed "naturally and probably from the carrying out of the joint enterprise." *Commonwealth* v. *Ambers*, 370 Mass. 835, 839 (1976).

What concerns me most is the manner in which the police investigators dealt with the defendant's apparent difficulty in understanding English. Of course, an interpreter is called for in such situations, but it should go without saying that the interpreter should be competent. There is no excuse for not having available at the outset a Miranda card in the relevant language. Here, the failure not to utilize a Miranda warning card in Cambodian in the Lynn area is incomprehensible.

Lastly, the majority does well to cite the recent report of the Commission to Study Racial and Ethnic Bias in the Courts, created by our Supreme Judicial Court, entitled, "Equal Justice" (1994), for the edification of the public at large, as well as judges and attorneys. This is one study that should not be placed on the bookshelf next to the canons of ethics to gather dust together.