WOLOHOJIAN, J.
*95 We are called upon in this interlocutory appeal to decide whether a Superior Court judge erred in allowing the defendant's motion to suppress statements he made during a police interview. The defendant's native and primary language is Moldovan but he also has some knowledge of Russian, a language *96 unrelated to Moldovan. To bridge the language barrier between the officers (who spoke English) and the defendant (who did not) the officers enlisted the help of a Russian-speaking student intern (intern). The intern had no knowledge of Moldovan, and was not a certified interpreter in Russian. After reviewing a videotape of the interview and conducting an evidentiary hearing that included testimony from a court-certified Russian interpreter, the judge found numerous irregularities in the way the intern carried out his interpretative role. These included instances where the intern omitted or changed words, phrases, and even questions and answers; instances where the intern suggested words to the defendant that the defendant adopted to his detriment; instances where the intern asked his own questions; and instances where the intern resorted to pantomime and gestures in an attempt to explain Russian words to the defendant and to help understand what *809 the defendant was trying to say. The judge concluded that the defendant was not effectively advised of his Miranda rights and that the defendant's statement was not voluntary because much of the statement was not his.
In this interlocutory appeal, the Commonwealth argues that (1) the defendant was not in custody, (2) as a result, Miranda warnings were not required, (3) in any event, the defendant's waiver of those rights was voluntary, and (4) the defendant's statement was voluntary. Like the judge, we conclude that the Commonwealth did not meet its burden of establishing voluntariness, and we affirm the order. Deciding as we do, we do not reach the Commonwealth's other arguments.
Background.[1] The defendant's motion to suppress was accompanied by an affidavit from counsel, who averred that he had communicated in person with his client using Russian interpreters. Each of the two interpreters had told him that the defendant was not fluent in Russian and had trouble expressing his thoughts in Russian. Counsel further averred that one of the interpreters had listened to the police interview of the defendant and was of *97 the view that the intern's translation from English to Russian (and vice versa) was faulty. Counsel suggested that a Moldovan interpreter was necessary for a proper waiver of the defendant's Miranda rights and in order to communicate meaningfully with the defendant.
Over the course of two days, the judge conducted an evidentiary hearing on the motion to suppress. Three witnesses testified: West Springfield police Detective Matthew Mattina, the intern, and Roman Jakub, a court-certified interpreter for Russian and Ukrainian. In addition to having the benefit of the testimony of these witnesses, the judge had the videotape of the interview, as well as a transcription of the interview containing a certified translation of the interview (certified translation). The judge made her detailed findings based on her assessment of the witnesses' testimony, the videotaped interview, and the certified translation. We note that, although the Commonwealth challenges the judge's ultimate conclusions, it does not contend that any of the judge's subsidiary findings are clearly erroneous. With that background in mind, we turn to the judge's findings, which are wholly confirmed by our independent review of the videotaped interview and the certified translation, as well as by the transcript of the evidentiary hearing.
The defendant is from Moldova, and his native language is Moldovan, a Romance language. He came to the United States three years before the events at issue in this case and has acquired an extremely limited understanding of English. He cannot effectively express himself in English, nor is there any indication that he can read or write English.
Moldova was part of the Soviet Union until 1991 and Russian (a Slavic language unrelated to Moldovan) was the official language during that time. After Moldova declared independence from the Soviet Union, Romanian became its official language.
*810 The defendant (who was born in 1985) was a young child when the Soviet Union dissolved. However, he acquired some knowledge of Russian as a secondary language in the sense that he can understand and speak it to a degree.[2] There is nothing to show that the defendant can read or write Russian.
*98 On the date at issue in this case, March 27, 2013, the defendant worked as a housekeeper in a nursing home in West Springfield. Police responded to a report that he may have touched a patient inappropriately.[3] Detective Mattina spoke to the defendant and immediately could tell that English was not his native language. The detective told the defendant that he wanted to speak with him at the police station. The defendant agreed and drove to the West Springfield station in his own automobile.
There is a large Russian-speaking population in West Springfield, and the police department routinely asks civilians to serve as interpreters. On that day, police enlisted the help of the intern, a twenty-five year old college student who was interning with the police department. The intern, whose first language was Russian, was a native of Kazakhstan and had moved to the United States when he was eleven years old. He began interpreting for the police at some point in 2007, while he was still in high school, after his wrestling coach, a West Springfield police officer, asked him to.
Detective Mattina and another detective interviewed the defendant for two hours at the police station with the intern acting as interpreter. The defendant was not handcuffed and the interview was conducted in conversational tones. The interview began with some basic preliminary questions, such as the defendant's name, date of birth, and type of work, which the defendant was able to answer in English. During the remainder of the interview the defendant did not speak English (with the exception of an occasional isolated word). The detectives spoke English, and the intern spoke English and Russian.
The detectives did not tell the defendant why he was at the station for questioning. But Detective Mattina did say that "we need to give you your rights" and then read the Miranda warnings in English from a printed card. The judge found:
"There were two sets of warnings available, one typed in English and one typed copy in Russian. [The intern] showed the defendant the warnings and asked him to sign the forms. [The intern] did not read the warnings to the defendant, yet the defendant claimed he understood the writings and signed both documents. In reviewing the recording, however, I find it clear that not only did [the intern] fail to actually read the documents to the defendant in Russian, there is no indication *99 from the recording that the defendant actually read the warnings from the Russian document. Further, [the intern] merely interpreted the warnings the police provided, and Jakub credibly testified that the warnings were not read, word for word, in Russian to the defendant."
No one asked the defendant what his primary language was, nor was any effort *811 made to determine if he could read Russian.
The judge found (and our review of the videotaped interview and the certified translation leads us to agree) that the interview was "truncated" in the sense that the various participants were often talking over each other, at cross purposes, or without understanding what the other was saying. The interview can fairly be characterized as consisting largely of confusion, with each participant often unable to understand what the others were saying. Much of this appears to be language driven because the defendant and the intern do not appear to have shared a mutual facility in a common language. But, in addition, there were numerous instances where the intern (1) mistranslated what the detectives asked or said, (2) asked an entirely different question from that posed by the detectives, (3) asked his own questions, (3) mistranslated the defendant's answers, (4) did not translate the defendant's answer at all, (5) added something the defendant did not say, (6) suggested words or answers to the defendant when the defendant apparently could not understand or find the words to express himself, and (7) himself answered the detectives' questions (without any statement having been made by the defendant).[4] These irregularities were not only limited to ancillary matters, but also occurred during questioning about the central issue under investigation: whether the defendant had inappropriately touched the patient. In addition, there were moments of complete failure in communication, with the intern having to resort to gestures and pantomime in order to attempt to bridge the language barrier. The judge found that "[t]he most *100 appalling aspect of the translated transcript is the number of instances where [the intern] led the defendant into making incriminatory statements."[5] She also found that "[t]he recorded interview and transcript are replete with instances where [the intern] created statements attributed to the defendant" and, thus, that "much of the statement was not his."
Discussion. In reviewing the judge's allowance of the defendant's motion to suppress, we "accept[ ] the judge's subsidiary findings of fact absent clear error, *812 give[ ] substantial deference to the judge's ultimate findings and conclusions of law, but independently review[ ] the correctness of the judge's application of constitutional principles to the facts found." Commonwealth v. Magee, 423 Mass. 381, 384, 668 N.E.2d 339 (1996), quoting from Commonwealth v. Mello, 420 Mass. 375, 381 n.8, 649 N.E.2d 1106 (1995). The constitutional principle at issue here is the due process requirement that an accused's statements in response to police questioning be voluntary.
"A statement is voluntary if it is the expression of a 'rational intellect' in its formulation and a 'free will' in its expression." Commonwealth v. Miller, 68 Mass. App. Ct. 835, 842, 865 N.E.2d 825 (2007), quoting from Commonwealth v. Davis, 403 Mass. 575, 581, 531 N.E.2d 577 (1988). In making this determination, "we examine whether, in light of the *101 totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act." Commonwealth v. Selby, 420 Mass. 656, 663, 651 N.E.2d 843 (1995). To be considered are "the characteristics of the accused and the details of the interrogation," Commonwealth v. Tavares, 385 Mass. 140, 146, 430 N.E.2d 1198 (1982), quoting from Commonwealth v. Daniels, 366 Mass. 601, 606, 321 N.E.2d 822 (1975), including (but not limited to) " 'promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings.' " Magee, supra at 388, 668 N.E.2d 339, quoting from Selby, supra."The Commonwealth bears the burden to establish beyond a reasonable doubt that the defendant's [statements were] voluntary." Commonwealth v. Monroe, 472 Mass. 461, 468, 35 N.E.3d 677 (2015). Statements that are involuntary, in this context, "are considered unreliable and incompetent evidence, repugnant to due process and inadmissible for any purpose at trial." Commonwealth v. Alcantara, 471 Mass. 550, 557 n.6, 31 N.E.3d 561 (2015). See United States v. Bernett, 495 F.2d 943, 951-952 (D.C. Cir. 1974) (interest in trustworthy evidence among values protected by due process).
We begin by noting that we have not found, nor have the parties pointed us to, a case from any jurisdiction that has concluded that a defendant's statements to police were voluntary when made in circumstances such as we have here. The interview was not conducted in the defendant's primary language. Contrast Commonwealth v. Martinez, 458 Mass. 684, 689, 694, 940 N.E.2d 422 (2011) (defendant questioned in native language by police officers). No effort was made to determine the defendant's facility in, or knowledge of, the language in which the interview was conducted. That language, Russian, is unrelated to the defendant's primary language of Moldovan. Miranda warnings were not given in the defendant's primary language. Contrast Commonwealth v. AdonSoto, 475 Mass. 497, 499, 58 N.E.3d 305 (2016) (interpreter orally provided Miranda warnings in defendant's native language); Commonwealth v. Santana, 477 Mass. 610, 613, 614, 82 N.E.3d 986 (2017) (defendant given written Miranda warnings in primary language, which he was able to read aloud); Commonwealth v. Sim, 39 Mass. App. Ct. 212, 220, 654 N.E.2d 340 (1995) (interpreter orally provided Miranda warnings in defendant's native language reading from "Cambodian Miranda card").
*102 Written Miranda warnings in Russian *813 were not read to the defendant; instead, he received an imperfect oral translation by the intern. In addition, written Miranda warnings in Russian do not appear to have been shown to the defendant and, even if they had been, there is nothing to indicate that the defendant could read Russian. "Police must recite Miranda warnings in a language, and in a manner, [that] an unlettered and unlearned defendant can understand." Commonwealth v. Siny Van Tran, 460 Mass. 535, 558, 953 N.E.2d 139 (2011). See Commonwealth v. Vuthy Seng, 436 Mass. 537, 544, 766 N.E.2d 492 (2002).
In addition, as the judge found and our review confirms, there were many times when the defendant and the intern had difficulty communicating and others when they resorted to gestures and pantomime to overcome the absence of a lingua franca. Contrast Siny Van Tran, supra at 559, 953 N.E.2d 139 (defendant's understanding of interpreter demonstrated by his "cogent, lucid, and[ ] ... logically calculated [verbal] responses"). Although the parties may disagree on the extent of the defendant's facility with the Russian language, there is no serious dispute that he was not fluent and that he struggled with Russian vocabulary during the interview. The judge credited the testimony of Jakub, a court-certified interpreter, that the defendant often did not understand even basic everyday words in Russian, let alone legal terms. By way of example, Jakub testified that the defendant did not know the Russian verb to "brush," a term that was central to the investigation and one the intern led the defendant to adopt.
The intern's interpretation was irregular and unreliable. He often mistranslated questions and answers, supplied questions and answers of his own, led the defendant into making incriminating statements, and suggested words to the defendant to the defendant's detriment.[6] See Commonwealth v. Ardon, 428 Mass. 496, 500, 702 N.E.2d 808 (1998) ("defendant also has the opportunity to discredit the translation or credibility of the interpreter in order to demonstrate the lack of a voluntary and intelligent waiver"). Although the police are not required to use certified or independent interpreters *103 when questioning suspects, id. at 499-500, 702 N.E.2d 808, "it should go without saying that the interpreter should be competent." Sim, supra at 224, 654 N.E.2d 340 (Brown, J., concurring). Here, there appear to have been no procedural safeguards designed to ensure the methods, accuracy, or reliability of the Russian-speaking intern acting as an interpreter for a Moldovan-native speaker.[7] *814 For all of these reasons, we see no error in the judge's conclusion that the Commonwealth did not establish beyond a reasonable doubt that the defendant's statement was voluntary. The interview was not conducted in the defendant's primary language. It was conducted in a language with which he had limited facility, through an untrained interpreter who did not confine himself to the task of accurately translating what the officers or the defendant said. The judge was on entirely solid ground when she concluded that, in these circumstances, the defendant's statements were not "his." As such they were neither an expression of his rational intellect or free will, nor were they reliable or competent evidence.
Order allowing motion to suppress affirmed.

"We recite the facts found or implicitly credited by the motion judge, supplemented by additional undisputed facts where they do not detract from the judge's ultimate findings." Commonwealth v. Jessup, 471 Mass. 121, 127-128, 27 N.E.3d 1232 (2015). We accept the judge's findings that rest on the testimony at the evidentiary hearing unless shown to be clearly erroneous. Commonwealth v. Thomas, 469 Mass. 531, 539, 21 N.E.3d 901 (2014). By contrast, findings that rest entirely on documentary evidence-in this case the videotaped interview and its transcription-are reviewed de novo. Ibid. See Commonwealth v. Clarke, 461 Mass. 336, 340, 960 N.E.2d 306 (2012).

The judge found, based on Jakub's testimony, that Moldovans are not uniformly conversant in Russian. A given Moldovan's knowledge of Russian depends upon a number of factors, including whether he or she lives in an urban or rural area and educational opportunities. The record does not supply these details with respect to the defendant.

The defendant has been indicted of one count of rape, G. L. c. 265, § 22(b ).

We have counted approximately ten instances where the intern mistranslated the detectives' question (or statement), eight instances where the intern asked a question other than the one the detective asked, twelve instances where the intern mistranslated the defendant's answers, twenty-two instances where the intern either did not translate the defendant's statement at all or did not translate it fully, thirty-three instances where the intern asked his own question, nine instances where the intern adds something to the defendant's answer, sixteen instances where the intern suggests either a word or an answer to the defendant, and nine instances where the intern supplied an answer without hearing from the defendant.

The judge found it significant that, at the evidentiary hearing, the intern admitted he didn't recall asking the defendant what his primary language was and noticed that the defendant "had problems finding [the] right vocabulary for some of the stuff." She highlighted this portion of defense counsel's cross-examination:
Defense counsel : "So he had difficulty finding the vocabulary to tell you what he wanted to convey to you. Is that correct?"
The intern : "Yes."
Defense counsel : "And his fluency in Russian, was it restricted by some of the words?"
The intern : "He seemed < pause> somewhat fluent in Russian, I mean maybe there was some hiccups in some of the vocab that he was looking to use."
Defense counsel : "And during the point you were interpreting, did you help him find the words?"
The intern : "Yes."
Defense counsel : "Did you suggest words to him?"
The intern : "Yes."

Although not controlling, it is instructive that the Standards and Procedures of the Office of Court Interpreter Services § 4.03 (2009), http://www.mass.gov/courts/docs/ocis-standards-procedures.pdf [https://perma.cc/92Q2-U567], adopted pursuant to G. L. c. 221C, § 7, provide:
"Court interpreters shall render a complete and accurate interpretation ... without altering, omitting, or adding to any utterances, either stated or written, to the best of their skill and ability."

Like the judge, we are concerned by the absence of procedural safeguards or protocols governing the interpreting that occurred in this case. Much hinges on the reliability and the accuracy of the interpretation and on its admissibility. Law enforcement agencies, therefore, may well consider it in their best interest to develop such procedural protocols. See, e.g., AdonSoto, 475 Mass. at 503-504, 58 N.E.3d 305 (variety of factors, including interpreter's qualifications and language skill, are to be considered in assessing whether interpreter will be viewed as defendant's agent for purposes of hearsay rule). In Commonwealth v. Festa, 369 Mass. 419, 429-430, 341 N.E.2d 276 (1976), the Supreme Judicial Court suggested a number of procedural guidelines to be followed when a witness testifies through an interpreter. Those guidelines are a practical means of achieving the beneficial purpose of eliminating "[p]roblems of distortion and confusion," such as occurred here. Id. at 429, 341 N.E.2d 276.