STATE OF MAINE
CUMBERLAND, ss.

UNIFIED CRIMINAL DOCKET
DOCKET NO. CV-19-03725

STATE OF MAINE )
)
)
)
v. ) ORDER ON DEFENDANT'S MOTION
) TO SUPPRESS
ABDULLA BALLA )
)
Defendant )
)
)
)

Before the Court is Defendant Abdulla Balla's ("Balla") Motion to Suppress. For the reasons set forth herein, Balla's Motion is DENIED.

**FACTUAL BACKGROUND**

Based on the testimony provided and exhibits admitted at hearing, as well as the parties' filings in this case to date, the court finds that the following facts are supported by the record:

On April 22nd, 2019, Detectives Condon ("Condon") and Cummings ("Cummings") of the Boston Police Department and two Massachusetts Department of Children and Families ("DCF") caseworkers responded to Madison Park High School, in Massachusetts, to investigate a report that a student had been sexually assaulted by her brother. The officers and DCF caseworkers arrived and spoke with the alleged victim who reported that her brother had sexually assaulted her on three occasions.

The first incident, and the conduct which underlies the charges here, occurred in Portland, Maine, in the fall of 2014. The alleged victim — then ten years old — described that she was

playing in the attic of her Portland apartment when her brother, later identified as Balla, approached her. The victim reported that Balla physically assaulted her and forced her to her knees so she could perform oral sex on him.

Shortly after the incident, Balla moved to Boston. The victim — Balla's sister — remained in Portland until 2017 when her family relocated to the Boston area as well. After relocating in 2017, the victim reported two more incidents of abuse.[1]

Condon, Cummings and the two DCF caseworkers traveled to the victim's house. When they arrived, they were greeted by Balla's mother and brother. His mother struggled to comprehend English, but the brother spoke it well and translated some of the ensuing conversation for her. The detectives requested to speak with Balla, so the brother called him requesting that he come to the house.

When Balla entered the residence, the detectives greeted him and Balla said he would talk to them. The detectives asked Balla to step into the living room and proceeded to question him, recording their conversation.[2] In the room were Balla, Condon, Cummings, and the two DCF caseworkers. Balla's family members — his mom and brother — remained in the kitchen area throughout the interview.

The conversation began with Balla reciting his date of birth, followed by Condon reading Balla his *Miranda* rights. Balla appeared to have a difficult time comprehending what Condon was saying. Cummings interjected and spoke with Balla who indicated he had a hard time hearing. Cummings then spoke louder, slower, and more deliberately than Condon, rereading Balla his *Miranda* rights. Cummings stopped multiple times to ask if Balla understood what he was saying. After both Condon's initial reading and Cummings' clarifications, Balla stated he

---

[1] Both incidents took place in Boston and thus are not subject to this court's jurisdiction.
[2] This recording was admitted as State's Exhibit 1 at hearing.

understood his rights and agreed to speak with the officers. Cummings concluded the warning by saying "I'm going to stress this one again. If you change your mind at some point, feel uncomfortable or you don't want to talk any more, you can stop, and nothing is going to happen to you for exercising that right. Do you understand all that?" Balla responded: "Yes."

Detective Condon began the interview by asking Balla about the incident in Portland. He first asked Balla if he lived with his sister in Portland, Maine. Immediately, Balla responded "What she is saying is right." Condon then said "[your sister] told us you may have been drunk, or high on marijuana." Balla clarified "oh yes, it was marijuana." Next Condon recounted the assault allegations saying "[your sister] told us that you forced her on her knees and put your penis in your mouth." Immediately, Balla said "like I said, it's true." Condon responded, "that's true?" and Balla stated "yes." Condon then continued the interview, asking Balla about the two Massachusetts based incidents.

Towards the end of the interview, Cummings circled back to the Maine incident, asking Balla "What happened up in Maine?" Balla responded by saying "that's a lot of crazy stuff there." Balla refused to talk anymore about the Maine incident but verbally confirmed to Cummings that something "bad" did happen in Maine, and that he "forced" his sister to "do something she didn't want to do." The interview concluded with Balla asking if the information he just shared would remain "between us five," presumably referring to the two detectives, the two DCF case workers and Balla. He also asked what was going to happen with the information.

The court finds that Balla had some understanding of English, but that it was limited to some degree. It is not clear from the record that he understood the legal ramifications of speaking to police without an attorney.

3

Condon testified they had probable cause to arrest Balla after interviewing the child. He also testified, and the court accepts, that they did not plan to arrest Balla at the time they visited the home. They typically look for some verification of a child victim's allegations and may consult with the local District Attorney's office before making an arrest.

After the interview, Condon and Cummings determined that they had probable cause to arrest Balla and did so. Condon later sent his investigative report to the Portland Police Department who forwarded it to the Cumberland County District Attorney's office. On August 19th, 2019, Balla was indicted by a Cumberland County grand jury on two charges. Count I of the indictment charges Gross Sexual Assault, Class A. Count II charges Unlawful Sexual Contact, Class A. On June 16th, 2021, Balla filed a Motion to Suppress and on May 3rd, 2022, a hearing was held in the Cumberland County Superior Court. After the hearing, the court gave the parties until May 17th, 2021, to submit written closing arguments.

## DISCUSSION

Balla first argues that his incriminating statements given on April 22nd, 2019, to Condon and Cummings should be suppressed on two grounds. First, he says that because he was in custody, a reading of his Miranda rights was required, and that his subsequent waiver of his Miranda rights was not knowing, intelligent or voluntary. Second, Balla challenges the voluntariness of his statements.

### I. Custody

The Fifth Amendment provides suspects the right against self-incrimination and requires law enforcement to read them certain rights before subjecting them to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966); *State v. Marden*, 673 A.2d 1304, 1309 (Me. 1996). *Miranda* applies only when a suspect is either in custody or the "functional equivalent of

4

custody." *Miranda*, 384 U.S. at 444. The State has the burden of proving by a preponderance that Miranda warnings were not required. *State v. Philbrick*, 436 A.2d 844, 850 (Me. 1981).

Whether a suspect is "in custody" is an "objective inquiry" involving an examination of the circumstance surrounding the interrogation and whether "a reasonable person [would] have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011). The ultimate question is, "[W]as there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest[?]" *J.D.B.*, 564 U.S. at 270.

The objective characteristics of an interrogation that may be considered in determining whether a defendant was in custody include, but are not limited to, the following factors:

(1) the locale where the defendant made the statements;

(2) the party who initiated the contact;

(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4) subjective views, beliefs, or intent that the police manifested to the defendant to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);

(7) whether the suspect was questioned in familiar surroundings;

(8) the number of law enforcement officers present;

5

(9) the degree of physical restraint placed upon the suspect; and

(10) the duration and character of the interrogation.

*State v. King*, 2016 ME 54, ¶ 17, 136 A.3d 366.

In this case, most of the objective factors support a finding that Balla was not in custody. Balla was questioned in his mother's home, a familiar location. At no time during the interview did the police communicate to Balla that they had probable cause to arrest him. Neither Condon nor Cummings communicated to Balla that he was in custody or that he was not free to leave. He was told he did not have to answer their questions.

Balla also did not seek to leave the living room where he was being questioned. He did not ask the detectives whether he was free to go, request to leave the room, or seek to communicate with family members who were close by in the kitchen. Thus, Balla did not elicit a response from the detectives which suggested he was not free to leave.

Balla was also not placed in any physical restraints. There were only two law enforcement officers present during the interrogation, and they were both dressed in plain clothes. The entire sequence of events — from the detectives' entry to Balla's arrest — lasted approximately thirty minutes. Condon and Cummings did not attempt to intimidate or threaten Balla.

The detectives did initiate contact with Balla, and it was clear from the outset that Balla was the subject of the detective's investigation. Although those two factors favor a finding of custody, the court finds that the rest of the factors fall in the State's favor. *Compare State v. Perry*, 2017 ME 74, ¶ 16, 159 A.3d 840 (holding that a defendant was not in custody when one uniformed officer initiated the contact and intended to arrest defendant but had not communicated that intent); *State v. Ames*, 2017 ME 27, ¶¶ 15-21, 155 A.3d 881 (citing *State v.*

6

*Kittredge,* 2014 ME 90, ¶¶ 7, 18 97 A.3d 106) (holding that a defendant was not in custody when the suspect was interviewed by two, uniformed officers for forty-five to sixty minutes); *with State v. Bridges,* 2003 ME 103, ¶¶ 27 -28, 829 A.2d 247 (holding that a defendant was in custody when the suspect was interviewed at a fire station, in a room that was the "functional equivalent" of a stationhouse interrogation room, by officers who repeatedly made false and misleading statements); *State v. Holloway,* 2000 ME 172, ¶ 23, 762 A.2d 223 (finding a non-mirandized defendant was objectively in custody when two detectives took him to his hotel room, indicated he was their prime murder suspect, aggressively questioned him, and continued to question him after he requested termination of questioning to contact an attorney.)

Because Balla was not subject to a custodial interrogation on April 22nd, 2022, the Miranda warnings provided by Condon and Cummings were not required. The court therefore does not reach an analysis of Balla's Miranda waiver.[3]

## II. Voluntariness

The State bears the burden to prove beyond a reasonable doubt that a defendant's statement was voluntary. *See State v. Lavoie,* 2010 ME 76, ¶ 18, 1 A.3d 408. A statement is voluntary if "it is the result of the defendant's exercise of his own free will and rational intellect." *State v. George,* 2012 ME 64, ¶ 21, 52 A.3d 903.

To determine whether statements made are voluntary, the Court considers the totality of the circumstances. *Id.* The court may consider the following factors in its voluntariness analysis: the details of the interrogation; duration of the interrogation; location of the interrogation;

---

[3] The court recognizes that Balla's counsel went to great lengths to make cogent and persuasive arguments as to Balla's waiver of his *Miranda* rights. Defense counsel commissioned a thorough expert report on Balla's comprehension and language capabilities, offered extensive expert testimony at hearing, and argued the legality of Balla's waiver at length in her closing. However, without a determination that Balla was in custody, the court does not reach Balla's challenge to the knowing, intelligent, and voluntary nature of his *Miranda* waiver. The expert's testimony was directed at whether the Defendant understood the Miranda warnings.

7

whether the interrogation was custodial; the recitation of Miranda warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct. *Id.*

Balla argues that his limited language proficiency should be considered in determining whether his statements were voluntary. In support, he cites a Massachusetts Supreme Judicial Court decision, *Commonwealth v. Lujan*, 99 N.E. 3d 806 (Mass. 2018). In *Lujan*, the defendant, a native Moldovan speaker, was suspected of touching a patient inappropriately and was asked to come to the police station for questioning. *Id.* at 810. There was a clear language barrier between the English-speaking officers and Lujan, so they asked an intern who was proficient in Russian (a language entirely unrelated to Moldovan) to interpret throughout the interrogation. *Id.* Given that the two languages were entirely unrelated, the intern was of little help, resulting in the defendant making — or adopting — several incriminating statements. *Id.* at 811. The Court upheld the trial court's decision to grant the defendant's motion to suppress, holding that the defendant's statements were involuntary because no effort was made to determine the primary language of the defendant and the intern who interpreted for police was not sufficient to break the language barrier. *Id.*

*Lujan* is distinguishable from this case. While it may have been clear to Condon and Cummings that English was not Balla's primary language, Condon testified — and the audio recording of the interview confirmed — that Balla understood enough English to provide answers to many of Condon's questions. On several occasions in the interview, Balla answered questions in a way that suggested he understood the detectives' questions. In contrast to *Lujan*, Balla was not a defendant who did not speak or understand English at all. The record instead

8

reflects that he was able to communicate competently with Condon and Cummings, in English, without an interpreter.

Here, under the totality of the circumstances, the court finds that Balla's statements made to Condon and Cummings on April 22nd, 2019, were voluntary. The interrogation was not confrontational in nature. It lasted only about fifteen minutes in length and took place in the living room of his family's home. As mentioned *supra*, 7, the interrogation was not custodial in nature and therefore did not require the administration of *Miranda* warnings.

The court is persuaded that Defendant may not have understood the legal aspects of the Miranda warnings and does not weigh that factor in the State's favor. The officers were clear, however, that he did not have to answer their questions. Two officers — Condon and Cummings — were present during the interview, and neither of them were overly persistent in their questioning, threatening, or deceptive. Balla was in good physical and mental health. Aged twenty eight at the time of the interview, Balla's age does not significantly impact this analysis. Per detective Condon's testimony and the recording of Balla's interview, Balla also appeared to be emotionally stable, exhibiting no concerning conduct.

The degree to which he understood the questions and the significance of his allegedly inculpatory responses are issues for trial. The court is persuaded beyond a reasonable doubt, however, that Balla's utterances were voluntary.

## CONCLUSION

The Defendant's Motion to Suppress is Denied. Balla was not in custody on April 22nd, 2019, and his incriminating statements were made voluntarily.

Dated: May 25, 2022

_____
Thomas R. McKeon
Justice, Maine Superior Court